EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Adolfo Krans Bell y otros<br><br>    Demandantes-recurridos<br><br>            v.<br><br>Antulio "Kobo" Santarrosa y otros<br>Ramos Ortiz<br><br>    Demandados-peticionarios | Certiorari<br><br>2007 TSPR 219<br><br>172 DPR _____ |

Número del Caso: CC-2007-516
          Ref. CC-2007-519


Fecha: 12 de diciembre de 2007


Tribunal de Apelaciones:

          Región Judicial de Bayamón Panel VII

Juez Ponente:

          Hon. Andrés Salas Soler

Abogados de la Parte Peticionaria:

          Lcdo. Juan R. Marchand Quintero
          Lcdo. Francisco Ortiz Santini
          Lcdo. José E. Colón Rodríguez

Abogado de la Parte Recurrida:

          Lcdo. Ángel L. Tapia Flores



Materia: Daños por Difamación de Figura Pública



Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Adolfo Krans Bell y otros
Demandantes-recurridos

v.

Antulio "Kobo" Santarrosa y otros
Demandados-peticionarios

*Certiorari*

CC-2007-516

Ref. CC-2007-519

RESOLUCIÓN

En San Juan, Puerto Rico, a 12 de diciembre de 2007.

A la solicitud de *certiorari* presentada por el peticionario Antulio "Kobo" Santarrosa, no ha lugar.

Lo pronunció y manda el Tribunal y lo certifica la Secretaria del Tribunal. Todos los Jueces intervinieron por Regla de Necesidad. El Juez Asociado señor Rivera Pérez disiente con opinión escrita.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Adolfo Krans Bell y/otros

   Demandantes Recurridos

         v                    CC-2007-516
                              Ref. CC-2007-519

Antulio "Kobo" Santarosa
y/otros

   Demandados Peticionarios

Opinión Disidente emitida por el Juez Asociado SEÑOR RIVERA PÉREZ.

San Juan, Puerto Rico, a 12 de diciembre de 2007.

Muy respetuosamente DISENTIMOS de la decisión de la Mayoría de no expedir el recurso de epígrafe. No compartimos el criterio de la Mayoría de no intervenir con lo resuelto por el foro intermedio apelativo, en cuanto a la suficiencia de la prueba presentada ante el Tribunal de Primera Instancia para sostener la existencia de malicia real en la publicación de la información alegadamente difamatoria. Debido a que dicha determinación no es congruente con la prueba desfilada en el foro primario y tampoco se ajusta a la pauta vigente sobre el tema, consideramos pertinente expresarnos por separado para plasmar nuestro criterio.

El presente recurso pone de manifiesto los esfuerzos realizados por este Tribunal para definir y conciliar apropiadamente la doctrina de difamación con las libertades de prensa y expresión, protegidas constitucionalmente. Mediante esta Opinión haremos, una vez más, el esfuerzo de proponer la formulación de un criterio categórico y uniforme, aplicable a todos los casos de difamación de figuras públicas. El norte de nuestras decisiones debe ser la estabilidad en la consecución de la verdad, la seguridad jurídica, la justicia y la igualdad.

La controversia principal del caso de autos es de índole evidenciaria, a saber, si desfiló ante el tribunal sentenciador prueba clara y convincente de la cual razonablemente se pudiera inferir la existencia de malicia real en la publicación. Específicamente debemos determinar si el señor Krans y sus hijos presentaron prueba suficiente que permitiera al juzgador de hechos concluir que los peticionarios abrigaban serias dudas sobre la certeza y veracidad de la información publicada. Veamos los hechos acaecidos que originan el presente recurso.[1]

---

[1] Resulta pertinente resaltar que este Tribunal no consolidó los casos CC-2007-516 y CC-2007-519 a pesar de que ambas controversias se originaron de los mismos hechos.

I

Para el año 2001, el señor Adolfo Krans Bell,[2] en adelante señor Krans, era el esposo de la entonces Gobernadora de Puerto Rico, la Honorable Sila María Calderón, en adelante la Gobernadora. Éste participó activamente en las campañas electorales de 1996 y 2000, en las cuales la Gobernadora aspiró a la posición de Alcalde de San Juan y de Gobernadora de Puerto Rico respectivamente. El señor Krans se afianzó como figura pública.[3] Según las determinaciones de hechos del Tribunal de Primera Instancia, luego del juramento y toma de posesión de su esposa como Gobernadora de Puerto Rico en el año 2001, la relación matrimonial entre ambos comenzó a deteriorarse.[4]

Por su parte, según indican las determinaciones de hechos del foro primario, el señor Antulio Santarrosa, en

---

[2] El señor Adolfo Krans es dueño de dos corporaciones, una dedicada al mercadeo de seguros y la otra es la propietaria del edificio donde ubican las oficinas de la primera. Ninguna de estas corporaciones compareció como parte demandante en el presente caso. Así lo indican las determinaciones de hechos del foro primario. Sentencia del Tribunal de Primera Instancia, Apéndice del recurso de *Certiorari* CC-2007-516, págs. 969-970; Apéndice del recurso de *Certiorari* CC-2007-519, págs. 29-30.

[3] El señor Krans participaba como ponente en el programa radial Fuego Cruzado y, asimismo se ha expresado vigorosamente en diversos foros, a favor de la unicameralidad, ello antes y después del referéndum que a esos efectos se celebró en el verano del 2005. Sentencia del Tribunal de Primera Instancia, Apéndice del recurso de *Certiorari* CC-2007-516, pág. 974; Apéndice del recurso de *Certiorari* CC-2007-519, pág. 34

[4] Sentencia del Tribunal de Primera Instancia, Apéndice del recurso de *Certiorari* CC-2007-516, pág. 970; Apéndice del recurso de *Certiorari* CC-2007-519, pág. 30.

adelante señor Santarrosa, es el productor del programa SuperXclusivo, transmitido por Televicentro de Puerto Rico, Inc., en adelante Televicentro y en conjunto los peticionarios. En el mismo, el señor Santarrosa, a través de su personaje "La Comay", divulga información sobre figuras públicas del país.[5]

Surge de la prueba creída por el foro primario que el 3 de agosto de 2001, antes de que saliera al aire el programa SuperXclusivo, la Gobernadora le comunicó telefónicamente al señor Krans su deseo de divorciarse y le indicó que envió un comunicado de prensa para hacer pública la noticia de su separación. Luego de advenir en conocimiento de la intención de la Gobernadora, el señor Krans se comunicó con sus hijos el señor Kendall, la señora Karusha y la señora Gretchen, todos de apellido Krans Negrón, en adelante los hijos, para notificarles su separación matrimonial.[6]

Tal y como lo recoge las determinaciones de hechos del Tribunal de Primera Instancias, avaladas por el foro apelativo intermedio, ese mismo día, es decir el 3 de agosto de 2001, el señor Krans y tres (3) de sus hijos se

---

[5] *Íd.*

[6] Cabe resaltar que el hijo mayor del señor Krans, el señor Kenneth Krans Negrón, al momento de los hechos se encontraba de vacaciones en China. No obstante, al referirnos a los hijos del señor Krans, se incluye al mismo. *Véase*, Sentencia del Tribunal de Primera Instancia, Apéndice del recurso de *Certiorari* CC-2007-516, pág. 971; Apéndice del recurso de *Certiorari* CC-2007-519, pág. 31.

reunieron en su oficina para observar el programa SuperXclusivo en el cual el señor Santarrosa, mediante su personaje "La Comay", leyó el comunicado de prensa que emitió la Gobernadora publicando su separación matrimonial. Es en dicho programa que el señor Santarrosa, a través de "La Comay", manifestó que el señor Krans alegadamente sostenía una relación extramarital con una mujer a la que le compró un apartamento, joyas y un vehículo de motor.[7] Es importante subrayar que el foro primario en sus determinaciones de hechos ni en parte alguna de su dictamen expresó la razón o motivo de por qué el señor Krans convocó a sus hijos a una reunión para observar el programa SuperXclusivo, inmediatamente después de haber advenido en conocimiento de la intención de su entonces esposa, la Gobernadora de Puerto Rico, de disolver el vínculo matrimonial entre éstos.

El 6 de agosto de 2001 uno de los hijos del señor Krans[8] le envió una comunicación escrita al señor Joe Ramos, gerente de Televicentro. Según las determinaciones de hechos del foro primario, mediante la referida carta éste le expresó la preocupación de su familia debido a la falsedad de la información difundida en el programa SuperXclusivo. A su vez, solicitó a Televicentro, que a

---

[7] *Íd.*

[8] El señor Kendall Krans Negrón.

través del programa SuperXclusivo se retractara de lo dicho.[9]

Los peticionarios, según sostienen las determinaciones de hechos del foro primario, no se retractaron de las imputaciones realizadas en contra del señor Krans. Por el contrario, en el programa SuperXclusivo del día 7 de agosto de 2001 el señor Santarrosa, a través de su personaje "La Comay", mostró a través de la televisión una cinta de video en la cual alegadamente y según sus expresiones, evidenciaba la relación extramarital imputada a éste. El contenido de dicha cinta nunca se presentó en el programa.[10] Posteriormente la Gobernadora instó una demanda de divorcio contra el señor Krans y el 6 de noviembre de 2001 se dictó una Sentencia que decretó roto y disuelto el matrimonio entre éste y la Gobernadora.

El 2 de agosto de 2002 el señor Krans y sus hijos presentaron ante el Tribunal de Primera Instancia, Sala Superior de Bayamón, una demanda contra el señor Santarrosa y Televicentro.[11] Mediante la misma, alegaron,

---

[9] Sentencia del Tribunal de Primera Instancia, Apéndice del recurso de *Certiorari* CC-2007-516, pág. 971; Apéndice del recurso de *Certiorari* CC-2007-519, pág. 31.

[10] Sentencia del Tribunal de Primera Instancia, Apéndice del recurso de *Certiorari* CC-2007-516, pág. 971-972; Apéndice del recurso de *Certiorari* CC-2007-519, pág. 31-32.

[11] Demanda, Apéndice del recurso de *Certiorari* CC-2007-516, págs. 1719-1723.

entre otras cosas, que las expresiones vertidas por el señor Santarrosa en el programa SuperXclusivo, a través de su personaje "La Comay", eran totalmente falsas, insultantes y con claro y malicioso menosprecio a la verdad. Adujeron que fueron difundidas con el único propósito de difamar el honor, la dignidad, el buen nombre y la reputación, personal y profesional del señor Krans a sabiendas de que lo expresado carecía de veracidad; y que Televicentro era responsable solidariamente por los actos de aquél, toda vez que como operador y dueño del canal no corroboró la veracidad y confiabilidad de la información difundida. [12]

Finalmente, el señor Krans y sus hijos aseveraron en la demanda que, a pesar de que se le notificó a los peticionarios mediante una misiva, la falsedad de la imputación, el señor Santarrosa no corrigió posteriormente la misma sino que por el contrario, éste sostuvo en una segunda transmisión del programa SuperXclusivo que tenía en su poder un video que alegadamente corroboraba las mismas. Por lo que solicitaron se le compensara por los daños morales, sufrimientos y angustias mentales así como las pérdidas económicas de sus empresas comerciales,

---

[12] *Véase* además, Demanda Enmendada de 28 de mayo de 2003, Apéndice del recurso de *Certiorari* CC-2007-516, págs. 1494-1499; Segunda Demanda Enmendada de 3 de mayo de 2004; Apéndice del recurso de *Certiorari* CC-2007-516, págs. 1434-1438 y Apéndice del recurso de *Certiorari* CC-2007-519, págs. 1-5.

sufridas como consecuencia de la difusión de dicha información.[13]

Luego de varios incidentes procesales, el Tribunal de Primera Instancia celebró un juicio.[14] Durante el mismo se presentó como evidencia las videograbaciones de los programas de SuperXclusivo, en las cuales constaban las expresiones del señor Santarrosa.[15] Con el propósito de establecer la malicia real en la difusión de la información se presentó además el testimonio de la señora Carmen Jovet Esteves, en adelante señora Jovet y mediante deposición, el del señor Leopoldo Fernández III, en adelante señor Fernández.[16] Éstos declararon, entre otras

---

[13] El señor Krans sostuvo que las actuaciones de los peticionarios afectaron negativamente su relación matrimonial y que contribuyeron a la eventual ruptura de su matrimonio con la Gobernadora. No obstante, el foro primario no avaló dicho argumento. Según las determinaciones de hechos del foro primario, la propia Gobernadora le indicó al señor Krans que lo transmitido por el programa SuperXclusivo no tuvo relación alguna con su decisión de divorciarse. Además, según indican las determinaciones de hechos de dicho foro, la infidelidad nunca se planteó en el trámite del mismo. Sentencia del Tribunal de Primera Instancia, Apéndice del recurso de *Certiorari* CC-2007-516, pág. 971; Apéndice del recurso de *Certiorari* CC-2007-519, pág. 31.

[14] El juicio se celebró durante los días 5, 8, 9, 19 y 21 de diciembre de 2005.

[15] Sentencia del Tribunal de Primera Instancia, Sentencia del Tribunal de Primera Instancia, Apéndice del recurso de *Certiorari* CC-2007-516, pág. 971; Apéndice del recurso de *Certiorari* CC-2007-519, pág. 31.

[16] El señor Fernández se desempeñaba como reportero del programa SuperXclusivo y era quien investigaba y reportaba eventos y noticias de la farándula y otras figuras públicas. Sentencia del Tribunal de Primera Instancia,

cosas, que el video que alegadamente corroboraba la relación extramarital que el señor Santarrosa imputó al señor Krans, nunca existió. El foro primario corroboró dichos testimonios con la videograbación del programa de la señora Jovet en el cual ésta entrevistó al señor Fernández sobre el particular.

En consecuencia, el Tribunal de Primera Instancia dictó una Sentencia mediante la cual declaró con lugar la demanda. Determinó que los peticionarios publicaron la información con malicia real, en su modalidad de grave menosprecio a la verdad, razón por la que impuso responsabilidad solidaria al señor Santarrosa y a Televicentro, determinando que los daños y perjuicios sufridos por el señor Krans y sus hijos ascendían a la suma de $260,000.[17] Resolvió, no obstante, que la evidencia

---

Apéndice del recurso de *Certiorari* CC-2007-516, pág. 970; Apéndice del recurso de *Certiorari* CC-2007-519, pág. 30.

Además, es pertinente resaltar que el Tribunal de Primera Instancia declaró al señor Fernández como testigo no disponible. Razón por la cual, mediante estipulación entre todas las partes, se presentó su deposición en evidencia. *Véase*, Sentencia del Tribunal de Primera Instancia, Apéndice del recurso de *Certiorari* CC-2007-519, pág. 32, esc. 1 y Apéndice del recurso de *Certiorari* CC-2007-516, [sin pág.].

[17] Dicha suma se desglosa de la manera siguiente: (1) $180,000 a favor del señor Krans; (2) $20, 000 a favor del señor Kendall Krans Negrón; (3) $20,000 a favor del señor Kenneth Krans Negrón; (4) $20,000 a favor de la señora Karusha Krans Negrón y; (5) $20,000 a favor de la señora Gretchen Krans Negrón. *Véase*, Sentencia del Tribunal de Primera Instancia, Apéndice del recurso de *Certiorari* CC-2007-516, pág. 989; Apéndice del recurso de *Certiorari* CC-2007-519, pág. 49.

presentada por el señor Krans y sus hijos no fue suficiente para probar que la información difamatoria vertida en el programa SuperXclusivo era la causa próxima de la merma en los negocios de éstos.

Inconformes con el referido dictamen, los peticionarios acudieron ante el Tribunal de Apelaciones mediante sendos recursos de Apelación.[18] Mediante Sentencia emitida el 12 de marzo de 2007 el foro apelativo intermedio confirmó la Sentencia apelada en todos sus extremos.[19]

Insatisfechos con dicho dictamen, los peticionarios acuden ante nos mediante sus respectivos recursos de *Certiorari*. En su recurso,[20] el señor Santarrosa le imputó al foro apelativo intermedio la comisión de los errores siguientes:

**ERRÓ EL TRIBUNAL DE APELACIONES AL CONFIRMAR Y CONCLUIR QUE MEDIÓ MALICIA.**

---

[18] Se presentaron ante el Tribunal de Apelaciones tres (3) recursos de Apelación. El KLAN2006004 se presentó el 12 de abril de 2006, por Televicentro. El KLAN200600482 se presentó el 19 de abril de 2006 por el señor Krans y sus hijos y el KLAN200600512 lo presentó el señor Sanatrrosa el 26 de abril de 2006. Los apelantes, desde distintas perspectivas y señalamientos de errores, perseguían la modificación de la Sentencia emitida el 7 de marzo de 2006 por el Tribunal de Primera Instancia, Sala Superior de Bayamón y modificada el 9 de marzo del mismo año. Razón por la cual el foro apelativo intermedio decidió consolidar los tres (3) recursos.

[19] Sentencia del Tribunal de Apelaciones, Apéndice del recurso de *Certiorari* CC-2007-516, págs. 62-91; Apéndice del recurso de *Certiorari* CC-2007-519, págs. 622-651.

[20] CC-2007-516.

**ERRÓ EL TRIBUNAL DE APELACIONES AL CONFIRMAR UNA COMPENSACIÓN POR ANGUSTIAS MENTALES DE CARÁCTER PUNITIVO.**

**ERRÓ EL TRIBUNAL DE APELACIONES AL CONFIRMAR QUE LOS DEMANDADOS PROCEDIERON CON TEMERIDAD.**

**ERRÓ EL TRIBUNAL DE APELACIONES AL CONFIRMAR QUE LA PARTE DEMANDANTE NO FUE TEMERARIA.**

Por su parte, Televicentro en su recurso de *Certiorari*[21] le imputó al foro apelativo intermedio la comisión de los errores siguientes:

**ERRARON LOS TRIBUNALES DE INSTANCIA Y APELACIONES, REGIÓN JUDICIAL DE BAYAMÓN, AL DESENTENDERSE DEL ESTADO DE DERECHO APLICABLE, EN BENEFICIO DE NOCIONES AJENAS A LA NORMATIVA DE EVALUACIÓN DE LOS DAÑOS EMOCIONALES QUE ESTABLECE TANTO LA JURISPRUDENCIA DE ESTE TRIBUNAL COMO EL TRIBUNAL SUPREMO DE LOS ESTADOS UNIDOS.**

**ERRARON LOS TRIBUNALES DE INSTANCIA Y APELACIONES, REGIÓN JUDICIAL DE BAYAMÓN, AL IGNORAR ABIERTAMENTE EL ESTADO DE DERECHO VIGENTE EN TORNO A LA IMPOSICIÓN DEL PAGO DE HONORARIOS DE ABOGADO EN UNA SITUACIÓN EN QUE NO MEDIÓ TEMERIDAD DE PARTE DE TELEVICENTRO.**

II

La libertad de prensa es un derecho fundamental consagrado en el Artículo II, Sección 4 de la Constitución de Puerto Rico. La referida cláusula constitucional garantiza que no se aprobará ley alguna que restrinja la libertad de palabra o de prensa y la reparación de agravios por violación a los mismos.[22] Esta disposición constitucional tiene su contraparte y modelo en la Primera

---

[21] CC-2007-519.

[22] Art. II, Sec. 4 Const. E.L.A., L.P.R.A., Tomo 1, ed. 1999, pág. 269.

Enmienda de la Constitución de los Estados Unidos.[23] Su propósito es el pluralismo económico y social dentro de un sistema liberal cimentado en la diseminación de ideas y el derecho del pueblo a estar debidamente informado. Por tanto, la libertad de prensa es condición necesaria para la libertad de expresión. En el desarrollo de una sociedad democrática ambas caminan juntas de la mano.[24] Sin conocimiento de hechos no se puede juzgar.[25]

La libertad de prensa tiene por finalidad servir como sustituto de la presencia directa del pueblo, por ser su derecho el estar debidamente informado de lo que acontece en su gobierno y en la gestión de los funcionarios públicos.[26] Además, permite fomentar el debate vigoroso,

---

[23] La Primera Enmienda de la Constitución Federal dispone los siguiente:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

[24] Oliveras v. Paniagua Diez, 115 D.P.R. 257, 268 (1984).

[25] P.P.D. v. Gobernador I, 139 D.P.R. 643, 681 (1995); Santiago v. Bobb y El Mundo, Inc., 117 D.P.R. 153, 159 (1986); Soto v. Srio de Jusiticia, 112 D.P.R. 477, 485 (1982).

[26] Zequeira Blanco v. El Mundo, Inc., 106 D.P.R. 432, 436 (1977). Véase además, Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 503-504 (1984) ("[T]he freedom to speak one's mind is not only an aspect of individual liberty -- and thus a good unto itself -- but also is essential to the common quest for truth and the vitality of society as a whole.").

precisamente en pro de ese derecho del individuo a estar informado.[27] Esto es imprescindible para la vivencia de nuestra democracia participativa.[28]

Consecuentemente, es ineludible que esta garantía constitucional cobije tanto la manifestación veraz como la incorrecta,[29] el ataque vehemente cáustico (hostil) y muchas veces desagradablemente punzante al gobierno, sus funcionarios y otras figuras públicas.[30] Las garantías conferidas por la libertad de prensa deben aplicarse no solamente a aquellos que se pueden clasificar por los tribunales como "prensa", sino a quienquiera y a cualquier medio que regularmente asuma la misión de prensa.[31] Es dentro de este contexto de las publicaciones de prensa que se manifiesta la difamación.

---

[27] Clavell v. El Vocero de P.R., 115 D.P.R. 685, 691 (1984); Torres Silva v. El Mundo, Inc., 106 D.P.R. 415, 420 (1977).

[28] *Véase*, Cabrero v. Zayas, 2006 T.S.P.R. 77, 2006 J.T.S. 86, 167 D.P.R. ___. (Opinión Disidente del Juez Asociado Señor Rivera Pérez).

[29] Zequeira Blanco v. El Mundo, Inc., *supra*, pág. 436. *Véase*, St. Amant v. Thompson, 390 U.S. 727, 732 (1968)("... to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones. We adhere to this view and to the line which our cases have drawn between false communications which are protected and those which are not.").

[30] Zequeira Blanco v. El Mundo, Inc., *supra*, pág. 436. Citando a New York Times v. Sullivan, 376 U.S. 254, 270 (1964).

[31] Oliveras v. Paniagua Diez, *supra*, pág. 268. Citando a B.J. Chamberlain, C.J. Brown, *The First Amendment Reconsidered*, New York, Longman, 1982, pág. 110.

III

En la esfera civil la difamación se define como desacreditar a una persona, publicando información falsa contra su prestigio, fama y reputación.[32] La misma abarca los conceptos de libelo[33] y calumnia[34], definidos estatutariamente por la Ley de Libelo y Calumnia de Puerto Rico,[35] codificada en el Código de Enjuiciamiento Civil, los cuales crean una causa de acción torticera, probadas cualquiera de éstos.[36] No obstante, hemos resuelto que es la Constitución de Puerto Rico y la Primera Enmienda de la

[32] I. Rivera García, *Diccionario de Términos Jurídicos*, 3ra ed. Revisada, San Juan, Lexis Publishing, 2000, pág. 74. *Véase* además, <u>Vélez v. García</u>, 2004 T.S.P.R. 169, 2004 J.T.S. 175, 163 DPR __, en donde definimos la difamación como *"desacreditar a una persona publicando cosas contra su reputación"*.

[33] Se entiende por libelo la difamación maliciosa que públicamente se hace en contra de una persona, por escrito, impreso, signo, retrato, figura, efigie u otro medio mecánico de publicación, tendente a exponer a dicha persona al odio del pueblo o a su desprecio, o a privarle del beneficio de la confianza pública y trato social, o perjudicarle en sus negocios; o de otro modo desacreditarle, menospreciarle o deshonrarle, o cualquiera difamación publicada, como antes se ha dicho, con la intención de denigrar o deprimir la memoria de un muerto y desacreditar o provocar a los parientes y amigos sobrevivientes. 32 L.P.R.A. sec. 3142.

[34] Se entiende por calumnia la publicación falsa o ilegal, que no sea un libelo, y que impute a una persona la comisión de un hecho constitutivo de delito, o tienda directamente a perjudicarle con relación a su oficina, profesión, comercio o negocios, o que, como consecuencia natural, le cause daños reales y efectivos. 32 L.P.R.A. sec. 3143.

[35] Ley de 19 de febrero de 1902. 32 L.P.R.A. 3141-3149.

[36] 32 L.P.R.A. sec. 3141 et seq.

Constitución de los Estados Unidos y no la Ley de Libelo y Calumnia las fuentes principales de la protección contra injurias. Dicho estatuto sobrevive tan solo en cuanto sea compatible con las mismas.[37]

Es preciso señalar que las normas constitucionales federales imponen las pautas y requisitos de protección mínimos a seguir. Ello es así, toda vez que Puerto Rico, como cualquier Estado de la Unión Americana, tiene facultad para establecer sus propias normas de responsabilidad por difamación, siempre y cuando no se imponga responsabilidad absoluta o que las reglas que se adopten no reduzcan el contenido mínimo de la Primera Enmienda de la Constitución Federal.[38]

La publicación de información y la diseminación de ideas, podría plantear un conflicto entre dos valores de alta jerarquía. Por un lado, la libertad de expresión que protege la diseminación de ideas e información, especialmente si se trata de personas que ocupan una posición pública. Por el otro, está el derecho que tiene toda persona, como parte de su intimidad, a la protección contra ataques abusivos a su honra, su reputación, vida

---

[37] Pérez v. El Vocero de P.R., 149 D.P.R. 427, 441 (1999); Méndez Arocho v. El Vocero de P.R., 130 D.P.R. 867, 876, (1992); Clavell v. El Vocero de P.R., *supra*, pág. 690; García Cruz v. El Mundo, Inc., 108 D.P.R. 174, 180 (1978); Cortés Portalatín v. Hau Colón, 103 D.P.R. 734, 738 (1975).

[38] *Íd.*

privada y familiar y a la inviolabilidad de la dignidad del ser humano.[39]

El ordenamiento jurídico constitucional vigente protege ambos intereses, razón por la cual los casos de difamación requieren del juzgador un delicado balance de intereses.[40] El derecho a la libre expresión no es irrestricto sino que puede condicionarse cuando intereses públicos apremiantes lo requieran.[41] Al condicionarse tal derecho deben considerarse las alternativas para alcanzar el objetivo de su limitación.[42]

Para que prospere una acción civil por libelo o difamación el promovente debe probar lo siguiente: (1) la falsedad de la información publicada; (2) los daños reales

---

[39] El Artículo II, Sección 8 de la Constitución de Puerto Rico dispone lo siguiente:

> Toda persona tiene derecho a protección de ley contra ataques abusivos a su honra, reputación y a su vida privada o familiar.

Art. II, Sec. 8, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1999, pág. 301.

[40] Pérez v. El Vocero de P.R., *supra*, págs. 441-442. *Véase* además, D. Biderman y otros, *Law and Business of the Entertainment Industries*, 4ta ed., Londres, Ed. PRAEGER, 2001, Londres, pág. 195. ("Just as the public figures "right of privacy" must yield to the public interest so too much "right of publicity" bow were such conflicts with the free dissemination of thoughts, idea, newsworthy events, and matters of public interest.").

[41] Pueblo v. Santos Vega, 115 D.P.R. 818, 821 (1984); Aponte Martínez v. Lugo, 100 D.P.R. 282, 290 (1971); Mari Bras v. Casañas, 96 D.P.R. 15, 21 (1968).

[42] Pueblo v. Santos Vega, *supra*. Citando a Rodríguez v. Srio. de Instrucción, 109 D.P.R. 251, 256 (1979).

sufridos a causa de dicha publicación; (3) la relación causal entre el acto negligente y los daños; (4) si el demandante es figura privada, hay que demostrar que las expresiones fueron hechas en forma negligente; y (5) si el demandante es **figura pública**, tiene que **probar** que la información fue publicada con **malicia real**, es decir **a sabiendas de su falsedad o con grave menosprecio de si era falso o no.**[43]

En nuestra jurisdicción rige la doctrina sentada por el Tribunal Supremo de los Estados Unidos en New York Times Co. v. Sullivan,[44] a los efectos de que no es difamatoria la publicación de un informe falso o de comentarios injustificados concernientes a la conducta de una figura pública, a menos que la información fuera publicada maliciosamente, esto es, a sabiendas de que era falsa o con grave menosprecio a la verdad.[45]

Esta doctrina, así como el concepto de libertad de prensa garantizado por la Sección 4 de nuestra Carta de

---

[43] Garib Bazain v. Clavell, 135 D.P.R. 475, 482 (1994); Méndez Arocho v. El Vocero de P.R., *supra*, págs. 877-878; Villanueva v. Hernández Class, *supra*, págs. 642-643; Maldonado y Negrón v. Marrero y Blanco, 121 D.P.R. 705, 715 (1988); Ocasio v. Alcalde Mun. de Maunabo, 121 D.P.R. 37, 61-62 (1988); González Martínez v. López, 118 D.P.R. 190, 192-193 (1987); Soc. de Gananciales v. López, 116 D.P.R. 112, 115 (1985); Oliveras v. Paniagua Diez, *supra*, pág. 262; García Cruz v. El Mundo, Inc., *supra*, pág. 178; Torres Silva v. El Mundo, Inc., *supra*, pág. 421; Zequeira Blanco v. El Mundo, Inc., *supra*, pág. 435.

[44] 376 U.S. 254 (1964).

[45] Soc. De Gananciales v. López, *supra*, pág. 115. *Véase* además, García Cruz v. El Mundo, Inc., *supra*, pág. 178.

Derechos y por la Primera Enmienda de la Constitución de los Estados Unidos, impusieron requisitos más rigurosos, que los establecidos en las disposiciones de la Ley de Libelo y Calumnia, en cuanto a la evidencia necesaria para probar la existencia de malicia real en la publicación.[46] Consecuentemente, cuando el promovente de una acción civil por difamación, ya sea por libelo (diseminación de información falsa por escrito) o calumnia (diseminación de información falsa oralmente) es una figura pública, éste tendrá que probar específicamente que quien publicó la información falsa actúo maliciosa e intencionalmente.[47] Tienen que alegarse y probarse **hechos específicos**. No es suficiente afirmar meramente que la publicación fue maliciosa.[48]

Es harto conocido que el concepto grave menosprecio a la verdad no puede encasillarse en una definición rígida, infalible e inflexible. No obstante, ello no significa que este Tribunal, como máximo intérprete de la ley y la Constitución, debe abstenerse de delimitar los contornos del mismo.[49] Podemos y debemos establecer unos **criterios**

---

[46] García Cruz v. El Mundo, Inc., *supra*, pág. 180; Torres Silva v. El Mundo, Inc., *supra*, pág. 423.

[47] La figura pública, como cualquier otro promovente, tiene la carga inicial de la prueba para apoyar las defensas alegadas. *Véase*, Pérez v. El Vocero, *supra*, pág. 446.

[48] Clavell v. El Vocero de P.R., *supra*, pág. 696; García Cruz v. El Mundo, Inc., *supra*, pág. 180.

[49] St. Amant v. Thompson, *supra*, 730-31. ("The Court noted that although reckless disregard cannot be fully

**uniformes y concretos** para que los juzgadores puedan aplicar de manera indistinta al determinar la existencia o no de grave menosprecio a la verdad.[50] Precisamente ésta es la ineludible e impostergable labor nuestra, establecer las pautas mínimas en derecho que guíen a los foros judiciales en su labor adjudicativa,[51] evitando así que

_____

encompassed within one infallible definition, and that, invariably, its outer limits would be marked out by a case-by-case adjudication, it was nonetheless true that cases prior to St. Amant had provided sufficient guidance to make it clear that St. Amant's conduct did not constitute recklessness.").

[50] Gertz v. Robert Welch, 418 U.S. 323, 344 (1974). ("[T]his approach would lead to unpredictable results and uncertain expectations, and it could render our duty to supervise the lower courts unmanageable. Because an ad hoc resolution of the competing interests at stake in each particular case is not feasible, we must lay down broad rules of general application. Such rules necessarily treat alike various cases involving differences as well as similarities. Thus it is often true that not all of the considerations which justify adoption of a given rule will obtain in each particular case decided under its authority.").

[51] *Véase*, Bose Corp. v. Consumers Union, supra, pág. 503. Citando a L. Green, Judge and Jury 286 (1930) (Chapter 10 of this work by Professor Green, 16 Va. L. Rev. 749 (1930)). ("And it must be kept in mind that the judge has another distinct function in dealing with these elements, which though not frequently called into play, is of the utmost importance. It involves the determination of the scope of the general formula, or some one of its elements. It comes into play in the marginal cases. It requires the judge to say what sort of conduct can be considered as condemned under the rules which are employed in such cases. It is the function through which the formulas and rules themselves were evolved, through which their integrity is maintained and their availability determined.").

éstos caractericen desacertadamente la naturaleza y contenido de la doctrina constitucional aplicable.[52]

La malicia real, siendo un elemento de intención subjetivo, nunca se presume. Es imprescindible que el promovente de la acción pruebe como mínimo, mediante evidencia **clara y convincente** que el demandado tenía serias dudas sobre la certeza de la información[53] y que albergaba un serio grado de conciencia sobre su probable falsedad.[54] La suficiencia de la prueba para establecer la existencia de malicia real es una cuestión estrictamente **de derecho**.[55] La prueba de mala voluntad u odio no

---

[52] En nuestra Opinión Disidente en Cabrero v. Zayas, *supra*, nos habíamos expresado sobre este aspecto al establecer lo siguiente:

> Cierto es que no podemos encerrar el grave menosprecio a la verdad al que se refiere la doctrina en una definición inflexible. Por ello, inevitablemente, la determinación de lo que constituye grave menosprecio a la verdad se hará mediante un análisis caso a caso. Ello obedece a una razón sencilla: la determinación de lo que constituye malicia real dependerá de los hechos particulares de cada caso. No obstante, ello no es óbice para que podamos darle contenido a dicho estándar constitucional.

[53] Villanueva v. Hernández Class, *supra*, pág. 643; Soc. De Gananciales v. López, *supra*, pág. 115; García Cruz v. El Mundo, Inc., *supra*, págs. 180-181.

[54] Soc. De Gananciales v. López, *Íd.*; García Cruz v. El Mundo, Inc., *Íd.*

[55] Villanueva v. Hernández Class, *supra*, págs. 644-645. *Véase* además, Garib Bazain v. Clavell, *supra*, pág. 485; Oliveras v. Paniagua Diez, *supra*, pág. 270; García Cruz v. El Mundo, Inc., *supra*, pág. 183.

satisface de por sí el grado constitucionalmente requerido de la prueba de malicia real.[56]

El requisito de la evidencia clara y convincente es significativamente más oneroso que el *standard* usual de la preponderancia de la prueba.[57] Estamos ante un requisito intermedio de prueba que se encuentra entre el de mera preponderancia de la prueba en casos civiles y el de más allá de duda razonable en casos criminales.[58] El mismo se estableció con el propósito de evitar y disuadir la autocensura de los medios de comunicación.[59] Dicho en otras palabras, se trata de evitar que los medios noticiosos, por temor a ser demandados y finalmente condenados al pago de cuantiosas sumas, puedan verse coartados en su derecho a expresarse libremente.[60]

El debido proceso de ley impone que para la negación de un derecho fundamental, como la libertad de prensa, la

---

[56] García Cruz v. El Mundo, Inc., *supra*, pág. 181. *Véase* además, Henry v. Collins, 380 U.S. 356 (1965); Rosenblatt v. Baer, 383 U.S. 75 (1966); Eckhardt, Jr. & McKey, Caldero v. Tribune Publishing Co.: Substantive and Remedial Aspects of First Amendment Protection for a Reporter's Confidential Sources, 14 Idaho L. Rev. 21 (1977).

[57] Tavoulareas v. Piro, 817 F.2d. 762, 776 (D.C. Cir. 1987).

[58] P.P.D. v. Admor. Gen. de Elecciones, 111 DPR 199, 224 (1981).

[59] Gertz v. Robert Welch, Inc., *supra*, pág. 342. ("…administers an extremely powerful antidote to the inducement to media self-censorship of the common-law rule of strict liability".).

[60] Méndez Arocho v. El Vocero de P.R., *supra*, pág. 880.

libertad de expresión y la dignidad humana, **el valor y suficiencia de la prueba** deben medirse con criterios **más rigurosos** que el de preponderancia de la prueba.[61] Por tal razón, en acciones de difamación de figuras públicas es un tanto difícil probar clara y convincentemente que la diseminación de información denigrante se publicó con serias dudas sobre su veracidad o grave menosprecio a la verdad.[62]

En fin, en controversias sobre difamación de figuras públicas, como en el caso de autos, la interrogante a dirimir por el juzgador de hechos es la siguiente: **¿presentó el demandante o promovente evidencia suficientemente clara y convincente para sustentar que el demandado actuó con malicia real en la publicación?** Para ello, el demandante o promovente puede hacer uso de evidencia directa o de evidencia indirecta o circunstancial.

IV

La Regla 10(H) de las de Evidencia de Puerto Rico[63] dispone que todos los casos pueden probarse mediante

---

[61] P.P.D. v. Admor. Gen. de Elecciones, *supra*, pág. 223.

[62] MacFarlane v. Sheridian Square Press, 91 F.3d 1501, 1515 (D.C. Cir. 1996). Citando a St. Amant v. Thompson, *supra*, pág. 731. ("Few public figures have been able clearly and convincingly to prove that the scurrilous things said about them were published by someone with 'serious doubts as to the truth of the publication'.").

[63] 32 L.P.R.A. Ap. IV, R. 10(H).

evidencia directa o indirecta o circunstancial.[64] Estos dos medios de prueba son esencialmente iguales y ambos se evalúan con el mismo criterio.[65] Hemos resuelto que la evidencia indirecta o circunstancial es intrínsecamente igual que la evidencia directa,[66] razón por la cual todos los hechos de un litigio pueden probarse mediante evidencia indirecta o circunstancial, aún en los casos criminales.[67]

La evidencia directa es aquella que prueba el hecho en controversia sin que medie inferencia o presunción, y que de ser cierta, demuestra el hecho de modo concluyente.[68] Por su parte la evidencia indirecta o circunstancial es aquella que presenta una base de hechos

---

[64] El inciso (H) de la Regla 10 de las Reglas de Evidencia de Puerto Rico dispone lo siguiente:

> Cualquier hecho en controversia es susceptible de ser demostrado mediante evidencia directa o mediante evidencia indirecta o circunstancial. Se entiende por evidencia directa aquella que prueba el hecho en controversia sin que medie inferencia o presunción alguna, y que de ser cierta demuestra el hecho de modo concluyente. Se entiende por evidencia indirecta o circunstancial aquella que tiende a demostrar el hecho en controversia probando otro distinto, del cual —en unión a otros hechos ya establecidos— puede razonablemente inferirse el hecho en controversia.

32 L.P.R.A. Ap. IV, R. 10(H).

[65] Pueblo v. Ortiz Rodríguez, 100 D.P.R. 972, 978 (1972).

[66] Pueblo v. Rivera Rivera, 117 D.P.R. 283, 294 (1986); Pueblo v. Salgado Velázquez, 93 D.P.R. 380, 383 (1966).

[67] Pueblo v. Picó Vidal, 99 D.P.R. 708 (1971).

[68] R. Emanuelli Jiménez, *Prontuario de Derecho Probatorio Puertorriqueño*, 2nda ed., San Juan, Ed. SITUM, Inc., 2005, pág. 165.

que mediante el uso de inferencias o presunciones, lleva razonablemente a la conclusión sobre otros hechos.[69]

El asunto específico bajo nuestra consideración requiere que examinemos con detenimiento los preceptos aplicables a la evidencia indirecta o circunstancial. Este tipo de evidencia opera a base de la inferencia, deducción y presunción. Una inferencia es la deducción que de los hechos probados hace en su discernimiento el juez o el jurado, sin que al efecto medie mandato de la ley.[70] Una presunción es una deducción de un hecho que la ley autoriza a hacer o requiere que se haga de otro hecho o grupo de hechos previamente establecidos en la acción.[71] Es la inferencia, deducción que hace en su discernimiento el juez o el jurado, que surge de una serie de hechos probados.[72]

A pesar de que la malicia real puede probarse mediante evidencia circunstancial,[73] no será de aplicación el *standard* general de la persona prudente y razonable

---

[69] *Íd.*

[70] *Íd.*

[71] *Íd.* Citando la Regla 13 de las Reglas de Evidencia vigentes.

[72] Pueblo v. Cortés del Castillo, 86 D.P.R. 220 (1962).

[73] Harte-Hanks Commc'n, Inc. v. Connaughton, 491 U.S. 657, 667 (1989) ("[A] plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence ... and it cannot be said that the evidence concerning motive or care never bears any relation to the actual malice inquiry."). *Véase* además, Herbert v. Lando, 441 U.S. 153, 160 (1979).

sino que aplicará el de evidencia clara y convincente.[74] El propósito es evitar que el juzgador de los hechos al evaluar cuestiones subjetivas, como el estado mental de la persona que publicó la información alegadamente difamatoria, convierta el proceso en una pesquisa sin fin sobre la irrazonabilidad del demandado en investigar la información o en su cumplimiento con los estándares aceptables de su profesión.[75]

Por tal razón, el Tribunal Supremo de los Estados Unidos estableció solamente tres instancias en las cuales la **evidencia circunstancial sobre la intención** subjetiva puede ser lo **suficientemente poderosa** para **proveer prueba clara y convincente** de malicia real. Las instancias son las siguientes: (1) cuando existe evidencia de que la historia fue fabricada o es producto de la imaginación de quien la publicó; (2) cuando existe evidencia de que el suceso es tan inherentemente improbable que solo una persona temeraria pudo publicarlo; o (3) cuando existe

---

[74] St. Amant v. Thompson, *supra*, pág. 731 ("These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.").

[75] *Véase* además, OAO v. Alfa Bank v. Center for Public Integrity, et. al, 387 F.Supp. 2d. 20, 50 (D.D.C. 2005) ("To prevent the inquiry into the defendant's subjective state of mind from slipping into an open-ended review of the reasonableness of the defendant's investigation or his compliance with the professional standards ...").

evidencia de que la información publicada se basó **única y exclusivamente** en una fuente en la cual existían razones obvias para dudar de su credibilidad.[76]

Es una norma debidamente asentada en nuestro sistema de justicia que la discreción judicial permea la evaluación de la evidencia presentada en los casos y controversias. Los jueces de instancia son quienes están en mejor posición de aquilatar la prueba, por ello su apreciación merece gran respeto y deferencia por parte de los tribunales apelativos. En ausencia de error manifiesto, perjuicio, parcialidad o pasión, no se intervendrá con sus conclusiones de hechos y apreciación de la prueba.[77] Solamente se podrá intervenir con estas conclusiones cuando la apreciación de la prueba no

---

[76] St. Amant v. Thompson, *supra*, pág. 732 ("The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.").

[77] Pueblo v. Miranda Ortiz, 117 D.P.R. 188, 191 (1986).

represente el balance más racional, justiciero y jurídico de la totalidad de la prueba.[78]

En Méndez v. Morales[79] resolvimos que aunque el arbitrio del juzgador de los hechos es respetable y merece deferencia, no es absoluto y una apreciación errónea de la prueba **no tiene credenciales de inmunidad frente a la función revisora de este Tribunal**.[80] Por consiguiente, aunque haya evidencia que sostenga las determinaciones de hecho del foro primario, **si de un análisis de la totalidad de la evidencia** este Tribunal queda convencido de que se cometió un error, como cuando las conclusiones están en conflicto con el balance más racional, justiciero, y jurídico de la totalidad de la evidencia recibida, podrá revocarlas.[81]

Según se desprende de los precedentes antes señalados, la deferencia no es óbice para nuestra revisión judicial, en un caso como el presente. Es por ello que al evaluar si la prensa se extralimitó en el ejercicio de su libertad de expresión e intervino con el

---

[78] R. Emanuelli Jiménez, op cit., pág. 156. Citando a Pueblo v. Rodríguez Román, 128 D.P.R. 121 (1991); Cárdenas Maxán v. Rodríguez, 125 D.P.R. 702 (1990); Zambrana v. Hospital Santo Asilo de Damas, 109 D.P.R. 517 (1980).

[79] 142 D.P.R. 26 (1996).

[80] Íd., pág. 36 (1996); Rivera Pérez v. Cruz Corchado, 119 D.P.R. 8, 14 (1987).

[81] Abudo Servera v. A.T.P.R., 105 D.P.R. 728, 731 (1977). Citando a Maryland Casualty Co. v. Quick Const. Corp., 90 D.P.R. 329, 336 (1964).

derecho a la intimidad y dignidad humana, dentro del contexto de la difamación de figuras públicas, debemos evaluar si el demandante presentó prueba clara y convincente para establecer los requisitos constitucionales de su acción.[82] En dichos casos, bajo el palio de nuestra Constitución y de la Constitución Federal, estamos obligados a realizar un **examen independiente** de **toda** la evidencia para determinar si el dictamen apelado constituye o no una intervención indebida en el ámbito de la libertad de expresión.[83]

V

Ante el claro mandato constitucional, legislativo y jurisprudencial antes esbozado, a la luz de toda la prueba obrante en autos, incluso la trascripción del testimonio

---

[82] Bose Corp. v. Consumers Union, *supra*, págs. 509-510. Citando a Time, Inc. v. Pape, 401 U.S. 279, 284 (1971) ("[In] cases in which there is a claim of denial of rights under the Federal Constitution, this Court is not bound by the conclusions of lower courts, but will reexamine the evidentiary basis on which those conclusions are founded, noting that in cases involving the area of tension between the First and Fourteenth Amendments on the one hand and state defamation laws on the other, we have frequently had occasion to review the evidence in the record to determine whether it could constitutionally support a judgment for the plaintiff."). (Citas omitidas).

[83] *Íd.*, pág. 499. Citando a New York Times Co. v. Sullivan, *supra*, págs. 284-286; NAACP v. Claiborne Hardware Co., 458 U.S. 886, 933-934 (1982); Greenbelt Cooperative Publishing Assn. v. Bresler, 398 U.S. 6, 11 (1970); St. Amant v. Thompson, *supra*, págs. 732-733. ("[I]n cases raising First Amendment issues we have repeatedly held that an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression."). (Citas omitidas).

que se desprende de la deposición del señor Fernández, concluimos que, tanto las determinaciones del foro primario como las del foro apelativo intermedio sobre la existencia de malicia real no están plenamente sostenidas por la parte demandante, mediante prueba clara y convincente. A pesar de que el señor Krans y sus hijos presentaron evidencia sobre los elementos esenciales del caso, esta prueba no puede dar base a una sentencia a su favor porque no satisface el criterio particular, como cuestión de hecho y de derecho, aplicable al caso de autos.[84]

La mera inexistencia del video, hecho sobre el cual se descansó para sostener la existencia de malicia real, no constituye base suficiente para razonablemente inferir que la información se divulgó con conocimiento de su falsedad o con grave menosprecio de si era falsa o no. La mera ocurrencia de este incidente no necesariamente da base de por sí, a una inferencia de malicia real.[85] Ello a pesar de que, el elemento de intención puede probarse con evidencia circunstancial.

---

[84] El profesor Rolando Emanuelli Jiménez, en lo pertiente expresa lo siguiente: *"[P]uede ocurrir que una parte cumpla con su obligación de presentar evidencia sobre las controversias esenciales del caso, pero ésta evidencia no puede dar base a una sentencia a su favor porque no satisfizo el criterio particular de persuasión del juzgador que sea aplicable al caso."* Op cit., pág. 150.

[85] *Véase*, Bacó v. Almacén Ramón Rosa Delgado, Inc., 151 D.P.R. 711, 724-725 (2000).

Contrario a lo resuelto por el foro primario y confirmado por el foro apelativo intermedio, de la deposición del señor Fernández, admitida como evidencia por estipulación entre todas las partes, no surge la existencia de malicia real en ninguna de sus dos modalidades. En su deposición éste categóricamente testificó que no tenía base alguna para creer que el señor Santarrosa conocía de la falsedad de la información o que albergaba dudas sobre su veracidad.[86] Más aún, el señor Fernández admitió haber mentido cuando aseveró públicamente, en la entrevista en el programa televisivo de la señora Carmen Jovet, que el señor Santarrosa conocía la falsedad de la imputación sobre adulterio lanzada contra el señor Krans.

Los foros inferiores tampoco reconocieron valor probatorio alguno al hecho de que el señor Fernández aceptó que todo lo que había dicho sobre el señor Santarrosa en las entrevistas que le concedió a la señora Jovet era falso. Que hizo tales manifestaciones porque se encontraba molesto por la forma en que se terminó la relación profesional entre ellos y que, dentro de ese estado de ánimo donde quiera que le dieran un foro

---

[86] *Véase*, Deposición del señor Leopoldo Fernández III, Apéndice del recurso de *Certiorari* CC-2007-516, pág. 1,188.

aprovechaba el mismo para descargarse contra el señor Santarrosa.[87]

De las declaraciones ofrecidas por el señor Krans no podemos razonablemente inferir que los peticionarios tuviesen serias dudas sobre la certeza de la información publicada ni que albergaban un grado de conciencia sobre su probable falsedad. El senor Krans indicó que en la carta cursada al gerente de Televicentro el 6 de agosto de 2001, se le notificó a los peticionarios que la información divulgada en el programa SuperXclusivo era falsa y que además, les solicitó que se retractaran de lo dicho. Añade que éstos no se retractaron y que por el contrario al siguiente día el señor Santarrosa, por medio de su personaje "La Comay", mostró una cinta de video que alegadamente corroboraba sus expresiones, pero cuyo contenido nunca se presentó.

Ninguno de estos señalamientos demuestra que para la fecha de la segunda transmisión, es decir el 7 de agosto de 2001, el señor Santarrosa tuviese conocimiento personal de la falsedad de la información.[88] En ausencia de

---

[87] *Íd.*, pág. 1,196.

[88] El tratadista Rodney A. Smolla, citando a <u>Bose Corp. v. Consumer Union</u>, *supra*, expresa en lo pertinente lo siguiente:

> [T]he Supreme Court, in reaffirming the principle of independent appellate review of the actual malice determination, again emphasized the subjective nature of the inquiry, noting that the actual malice issue before it "rests entirely on an evaluation of the [author's] state of mind when he

evidencia adicional que sostuviera las alegaciones de la carta, es forzoso concluir que la información no se publicó con grave menosprecio sobre su veracidad.[89] Para que la negación de las imputaciones (alegadamente difamatorias) pueda sostener una determinación de malicia real, debe existir evidencia adicional que, en unión a ésta, permita al juzgador inferir razonablemente que la información se publicó con grave menosprecio a la verdad.[90]

---

wrote his initial report, or when he checked the article against that report." (Corchetes en el original.)

2 *Smolla and Nimmer on Freedom of Speech*, Sec. 23:3, pág. 23-14 (2006).

[89] En <u>Harris v. City of Seattle</u>, 152 Fed. Appx. 565, 33 Media L. Rep. (BNA) 2473 (9no Cir. 2005), el Tribunal de Apelaciones Federal para el Noveno Circuito resolvió que las meras alegaciones de un demandante, a los efectos de que negó la veracidad de la información divulgada, no establecen de por sí que el reportero actuó con grave menosprecio a la verdad.

[90] *Véase*, *Smolla and Nimmer on Freedom of Speech*, op. cit. Sec. 23:3, págs. 23-16, 23-17 (2006). ("A person who is the subject of a story being investigated will often strongly deny the defamatory charges, either personally or through a lawyer or other representative. Such a denial may or may not impact on the actual malice calculus, depending on the circumstances. If the denial is of a kind that would plausibly induce subjective doubt, then the denial may be a factor that can be used to construct a case for the existence of actual malice, for once a publisher has reasons to doubt the accuracy of a story, the publisher must act reasonably to dispel those doubts prior to publishing. However, a reporter need not believe self-serving denials, as "such denials are so commonplace in the world of polemical charge and countercharge." A denial only serves to buttress a case for actual malice when there is something in the content of the denial or supporting evidence produced in conjunction with the denial that carries a doubt-inducing quality.").

Cónsono con lo anterior, concluimos que la evidencia circunstancial en el caso de autos no es lo suficientemente clara, ni convincente para establecer la **intención** subjetiva de los peticionarios al momento de la publicación.

En primer lugar, no existe evidencia de que los demandados fabricaron el contenido de la publicación.

En segundo lugar, no existe evidencia de que el suceso constituye uno tan inherentemente improbable, que solamente una persona temeraria pudo publicarlo. No obstante, aclaramos que con ello no pretendemos resolver y tampoco insinuar que las manifestaciones del señor Santarrosa tengan visos de certeza o veracidad. Nuestro escrutinio queda reducido a evaluar sus expresiones sobre tal requisito o elemento delineado por la norma jurisprudencial aplicable como para permitir una inferencia razonable de malicia real.

Finalmente, el hecho de que la información divulgada por el señor Santarrosa en el programa SuperXclusivo proviene, en algunas ocasiones, de llamadas telefónicas del público a través de líneas que se tienen disponibles para este fin,[91] no necesariamente tal situación apunta de

---

[91] El foro primario en su determinación de hechos número cinco (5) estimó probado lo siguiente:

El señor Santarrosa es titeretero. A través de su personaje "La Comay", divulga información, entre otras cosas, de figuras públicas del país. Normalmente esta información proviene de llamadas

por sí a la presencia de malicia real.[92] En el caso de autos los demandados no basaron totalmente la información publicada en una llamada telefónica anónima sobre la cual existieran serias dudas sobre su veracidad.[93] De la trascripción del testimonio de la deposición del señor Fernández se desprende que el señor Santarrosa tenía fuentes independientes, las cuales no revelaba, que le daban información a la mano.[94]

Por las razones antes discutidas, somos del criterio que la evidencia presentada no cumple con el *quantum* de prueba clara y convincente requerido para los casos de difamación de figuras públicas.

VI

Ciertamente, esta no es la primera vez que consideramos la reconciliación o balance de derechos o

---

telefónicas del público a través de líneas telefónicas que él tiene disponibles para ese fin.

Sentencia del Tribunal de Primera Instancia, Apéndice del recurso de *Certiorari* CC-2007-516, pág. 970; Apéndice del recurso de *Certiorari* CC-2007-519, pág. 30.

Con esto el foro primario parece sugerir que toda la información publicada en el programa SuperXclusivo carece de confiabilidad y corrección por obtenerse a través de llamadas telefónicas anónimas.

[92] *Véase*, McFarlane v. Sheridian Square Press, *supra*, pág. 1510; Clyburn v. News World Commc'm, Inc., 705 F. Supp. 635, 641-642 (D.D.C. 1989) ("Defendant's reliance on the confidential sources, who, in turn, relied on informants, does not indicated actual malice.").

[93] McFarlane v. Sheridian Square Press, *supra*, pág. 1512.

[94] *Véase*, Deposición del señor Leopoldo Fernández III, Apéndice del recurso de certiorari CC-2007-519, págs. 1171-1172.

intereses en materia de la libertad de expresión. Nuestro criterio siempre es el resultado de un intenso esfuerzo de darle vida y sentido y, de aplicar unos preceptos constitucionales. No estamos, pues, ante una decisión o una nueva regla que permita justificar solo su prospectividad. Es un contrasentido que negáramos sus efectos.

Nuestro historial refleja que la tendencia seguida por este Tribunal ha sido a favor de la divulgación de información pública, al punto de impartirle una dimensión amplia y robusta a la libertad de expresión consagrada en nuestra Carta de Derechos.[95] No obstante, la Mayoría ignora dicha tendencia en este caso.

El proceso adjudicativo puertorriqueño responde en su realidad al postulado de igualdad inmerso en la Constitución de Puerto Rico el cual persigue lograr una igualdad y paridad entre todos los ciudadanos, incluyendo la prensa, para la divulgación de ideas en el país.[96]

No podemos ignorar, con un parco "no ha lugar", la trayectoria de este Tribunal y la tendencia seguida a través de su facultad adjudicativa a favor de la

---

[95] P.P.D. v. Gobernador I, *supra*, pág. 680. Citando a Noriega v. Gobernador, 130 D.P.R. 919 (1992); Noriega v. Gobernador, 122 D.P.R. 650 (1988); López Vives v. Policía de P.R., 118 D.P.R. 219 (1987); Soto v. Srio. de Justicia, *supra*, pág. 485; Dávila v. Superintendente de Elecciones, 82 D.P.R. 264 (1960) y Sierra v. Tribunal Superior, 81 D.P.R. 554 (1959).

[96] *Véase*, P.P.D. v. Gobernador II, 136 D.P.R. 916, 923-924 (1994).

divulgación de información cuando de la controversia traída ante nuestra consideración a todas luces se desprenden los méritos para la aplicación de la norma pautada. Ello propicia la inestabilidad, erigiéndose así un estado de derecho incoherente, huérfano de reglas uniformes necesarias que guíen la función adjudicativa de los tribunales y la conducta de los ciudadanos. No podemos avalar tal práctica.[97]

---

[97] En <u>Cabrero v. Zayas</u>, *supra*, la Mayoría de este Tribunal desestimó sumariamente una demanda de libelo que instó un ex-funcionario público en contra del periódico El Nuevo Día por estimar que éste no contaba con prueba para establecer los requisitos constitucionales de su acción. En aquel caso el demandante, el señor Antonio Cabrero Muñíz, quien se desempeñaba al momento de los hechos como Síndico Especial de la Oficina para la Liquidación de las Cuentas de la Corporación de Renovación Urbana y Vivienda, contaba con **evidencia directa** que sostenía sus alegaciones que las expresiones del periódico eran falsas y fueron divulgadas con grave menosprecio a la verdad. Demostró además, que ofreció evidencia a la reportera sobre el asunto divulgado por ella públicamente con el propósito de que corrigiese sus expresiones previas.

No obstante, este Tribunal resolvió que el señor Antonio Cabrero Muñíz no aportó **evidencia clara y convincente** cuya posible credibilidad justificara una determinación de que el periódico El Nuevo Día en su publicación hizo expresiones difamatorias, falsas y con malicia real. En síntesis este Tribunal determinó que la intención de grave menosprecio a la verdad o conocimiento de la verdad no podía razonablemente inferirse de una investigación periodística defectuosa. Aún con el **conocimiento** por la periodista de la existencia de una evidencia que decidió no examinar y que alegadamente apuntaba en dirección contraria.

En el caso antes reseñado, a diferencia del caso de autos, el demandante contaba con evidencia directa para probar, en la etapa de sentencia sumaria, la existencia de una controversia esencial sobre la presencia de malicia real en la publicación. No obstante, la Mayoría de este Tribunal determinó que la misma era insuficiente para dicho fin. Por el contrario, en el caso de autos, donde la

No es la primera vez que consideramos estos asuntos Esta preocupación invade nuestra conciencia. En P.N.P. v. Gobernadora,[98] nos expresamos a los efectos de que este Tribunal, al no pasar juicio sobre casos y controversias como el presente, claudica su función revisora, deber ministerial que nos fuera encomendado por la Constitución de Puerto Rico.[99] Nos reiteramos que ello atenta

_____

única evidencia con la cual contaban los demandantes, el señor Krans y sus hijos, para probar la existencia de malicia real en la publicación es indirecta o circunstancial, a saber la inexistencia del video, la Mayoría estimó que la misma era suficiente para hacer una inferencia razonable sobre la intención de grave menosprecio a la verdad o conocimiento de la verdad al momento de la publicación.

[98] *Supra*, (Opinión Disidente del Juez Asociado Señor Rivera Pérez).

[99] En este punto nos parece pertinente ilustrar el tema con una cita de Bose Corp. v. Consumers Union, *supra*, págs. 510-511. En dicho caso el Tribunal Supremo Federal de los Estados Unidos, por conducto del Juez Stevens, resolvió lo siguiente:

> The requirement of independent appellate review reiterated in New York Times Co. v. Sullivan is a rule of federal constitutional law. It emerged from the exigency of deciding concrete cases; it is law in its purest form under our common-law heritage. It reflects a deeply held conviction that judges --and particularly Members of this Court --must exercise such review in order to preserve the precious liberties established and ordained by the Constitution. The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice."

directamente contra el axioma de igualdad que es imprescindible para nuestra sociedad, socavando de esa forma los pilares de nuestro esquema constitucional.

La justicia debe ser inmaculada no sólo en su realidad interior sino también en su apariencia externa.[100] Sobre este particular es de vital importancia la consistencia en la adjudicación. A pesar de que la coherencia de nuestras normas no constituye una garantía absoluta de la corrección de nuestras decisiones, ser consistentes al adjudicar le imprime estabilidad, confiabilidad y credibilidad a nuestro sistema de justicia así como a nuestra democracia constitucional.[101]

En aras de salvaguardar el derecho a la libertad de expresión y a la libertad de prensa, debemos siempre tratar de ser consistentes. De otra forma, existe el peligro, en un caso como el presente, que se utilice el poder y discreción judicial para castigar la expresión que resulta antipática. Es impermisible colocar o tratar de forma diferente a sectores de la prensa meramente porque su estilo y editorial se aparte de lo que regularmente los tribunales han clasificado como prensa tradicional.[102]

---

[100] P.N.P. v. Gobernadora, *supra*, (Opinión Disidente del Juez Asociado Señor Rivera Pérez). Citando a In re Rodríguez Torres, 104 D.P.R. 758, 766 (1926).

[101] P.N.P. v. Gobernadora, *supra*, (Opinión Disidente del Juez Asociado Señor Rivera Pérez).

[102] *Véase*, Anderson v. Cryovac, Inc., 805 F.2d. 1, 9 (1er Cir. 1986). ("The danger of favorable treatment of certain members of the media is obvious: it allows the government

Igualmente, en aras de salvaguardar el derecho a la intimidad y al inviolable principio de la dignidad del ser humano que tiene toda figura pública, el trato que le dispensemos a ésta tiene que responder a nociones de igualdad y equidad.

VIII

Por todos los fundamentos antes expuestos respetuosamente DISENTIMOS del curso de acción de este Tribunal. Expediríamos el recurso y revocaríamos las Sentencias dictadas por el Tribunal de Primera Instancia y el Tribunal de Apelaciones.

Efraín E. Rivera Pérez
Juez Asociado

---

to influence the type of substantive media coverage that public events will receive. Such a practice is unquestionably at odds with the First Amendment."); Zacchini v. Scripps-Howard Broadcasting Company, 433 U.S. 562, 578 (1977) ("[T]here is no doubt that entertainment, as well as news, enjoys First Amendment protection. It is also true that entertainment itself can be important news.").